Recurrent Energy Dev. Holdings, LLC v. SunEnergy1, LLC, 2018 NCBC 59.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
16 CVS 15107

RECURRENT ENERGY
DEVELOPMENT HOLDINGS, LLC,

          Plaintiff,

v.

SUNENERGY1, LLC,

          Defendant.

**ORDER AND OPINION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

1.    **THIS MATTER** is before the Court on Plaintiff's and Defendant's motions for summary judgment (the "Motions"). Having considered the Motions, the briefs, and the arguments of counsel at a hearing on the Motions, the Court **GRANTS in part** and **DENIES in part** Plaintiff's motion and **DENIES** Defendant's motion.

> *Poyner Spruill LLP, by Lee A. Spinks, Cynthia L. Van Horne, and Sarah L. DiFranco, for Plaintiff.*

> *Robinson, Bradshaw & Hinson, P.A., by John R. Wester, Douglas M. Jarrell, and Fitz E. Barringer, for Defendant.*

Robinson, Judge.

## I.    INTRODUCTION

2.    This litigation arises out of a dispute between two developers of solar energy projects over the parties' obligations in connection with the purchase and sale of two solar energy projects in northeastern North Carolina and a tax equity transaction involving a third solar energy project. Plaintiff Recurrent Energy Development Holdings, LLC ("Recurrent") sought to purchase, and Defendant

SunEnergy1, LLC ("SunEnergy") sought to sell, two solar energy projects. Recurrent and SunEnergy entered into a Confidential Letter of Intent ("LOI") pursuant to which Recurrent paid SunEnergy for the exclusive rights to purchase the projects and market the projects' power, and SunEnergy agreed to a timeline by which it was to develop the projects. In addition, the parties expressly agreed to negotiate in good faith for Recurrent to make a tax equity investment in a third solar energy project that SunEnergy was developing, and SunEnergy agreed to reimburse Recurrent for its costs and expenses incurred in connection with the negotiation of the tax equity transaction.

3. Recurrent initiated this action alleging that SunEnergy failed to develop the projects in accordance with the deadlines set forth in the LOI and failed to reimburse Recurrent for its costs and expenses incurred in connection with the tax equity transaction. SunEnergy filed a counterclaim alleging that Recurrent breached its obligation under the LOI to negotiate the tax equity transaction in good faith.

## II.    FACTUAL BACKGROUND

4. The Court does not make findings of fact when ruling on motions for summary judgment. *E.g.*, *In re Estate of Pope*, 192 N.C. App. 321, 329, 666 S.E.2d 140, 147 (2008). The following factual background, taken from the undisputed evidence submitted in support of and in opposition to the Motions, is intended solely to provide context for the Court's analysis and ruling.

**A. The Parties**

5.   Recurrent is a Delaware limited liability company with its principal office in San Francisco, California. (SunEnergy, LLC's First Am. Answer & Countercl. 10, ¶ 2, ECF No. 28 ["Answer"]; Answer to Countercl. ¶ 2, ECF No. 39 ["Reply"].) Recurrent develops solar energy projects and sells the solar power to third parties. (Answer 10, ¶ 2; Reply ¶ 2; Pl.'s Resp. Opp'n Def.'s Mot. Partial Summ. J. ["Pl.'s Resp. Opp'n"] Ex. 2, at 56:3−6, ECF No. 82.1.)

6.   SunEnergy is a North Carolina limited liability company with its principal place of business in Mooresville, North Carolina. (Am. Compl. ¶ 2, ECF No. 8; Answer 2, ¶ 2.) SunEnergy develops and builds solar energy projects throughout North Carolina. (Am. Compl. ¶ 2; Answer 2, ¶ 2.)

**B. LOI**

7.   In or around December 2015, Amazon Web Services, Inc. ("Amazon") issued a request for proposal ("RFP") to Recurrent and others soliciting the sale of solar power from an area of the United States known as the "PJM" region, which includes a small part of northeastern North Carolina. (SunEnergy's Mem. Supp. Mot. Partial Summ. J. ["Def.'s Mem. Supp."] Tab 1, at 45:9−25, ECF No. 89; SunEnergy's Mem. Opp'n Pl.'s Mot. Summ. J. ["Def.'s Mem. Opp'n"] Tab 2, at 43:5−14, ECF No. 78; *see* Def.'s Mem. Supp. Dep. Ex. 33, ECF No. 55.) A response to the RFP needed to identify solar project site(s) that the bidder sought to use in generating power and the price at which it would sell that power to Amazon. (Def.'s Mem. Supp. Tab 1, at 52:1−12.)

Amazon would then shortlist a few of the proposals from which it would ultimately make its final decision. (Def.'s Mem. Supp. Tab 1, at 53:19–25.)

8. Recurrent did not have its own solar energy sites in the PJM region that it could submit in response to the Amazon RFP. (Def.'s Mem. Opp'n Tab 2, at 46:14–18.) As a result, Recurrent sought to acquire sites in the PJM region from a third party that it could include in its response to the Amazon RFP, which was due on February 11, 2016. (Def.'s Mem. Supp. Dep. Exs. 33, 50; Def.'s Mem. Opp'n Tab 2, at 44:25–45:8, 46:14–18.) On December 7, 2015, Cassidy Deline ("Deline"), who led Recurrent's mergers and acquisitions team, contacted SunEnergy and inquired whether it had any projects available for acquisition. (Def.'s Mem. Supp. Dep. Ex. 33.)

9. Following negotiations, on February 11, 2016 (the same day as the deadline for Recurrent's submission to Amazon), Recurrent and SunEnergy executed the LOI. (Am. Compl. ¶ 4; Answer 3, ¶ 4.) The LOI set forth the parties' agreement on certain matters pending consummation of a proposed transaction whereby Recurrent would buy, and SunEnergy would sell, all of the assets necessary for the development of one or two 80 megawatt (alternating current) ("MWac") solar energy projects within the PJM region in North Carolina, one in Bertie County ("Earleys") and one in Gates County ("Haslett") (the "Project(s)"), and, if applicable, the replacement project(s) (the "Proposed Transaction"). (Pl.'s Mem. Supp. Mot. Summ. J. Ex. 1 ["LOI"], ¶ B, Sched. 1.) The LOI specifically identified three additional projects with the same MWac capacity as the Projects (the "Replacement Project(s)"): Moyock Solar, LLC

("Moyock"); Shawboro East Ridge Solar, LLC ("Shawboro"); and Hobbsville Solar, LLC ("Hobbsville"). (LOI Annex C.)

10. Under the terms of the LOI, Recurrent could pay $2 million to SunEnergy in connection with each Project (the "Exclusivity Payment") to secure a twelve-month exclusivity period during which SunEnergy agreed not to engage in any activity that would effect a disposition of the Projects or the "Project Assets," which is defined as "all assets necessary for the development of one or both of the Projects and, as applicable, the Replacement Project(s)[.]" (LOI ¶¶ B, 1.)

11. For each Project, the LOI set forth target development milestone deadlines by which SunEnergy was to achieve certain objectives in developing the Projects (the "TDM"). (LOI ¶ 3, Annex B.) With respect to both Projects, the TDM required issuance of discretionary permits by August 30, 2016. (LOI Annex B.) The Earleys TDM required complete wetlands delineation by April 30, 2016. (LOI Annex B.)

12. Paragraph 3 provided that

> [i]n the event that [SunEnergy] fails to achieve the [TDM] for a Project . . . , [Recurrent] shall have the right, by written election to [SunEnergy], to purchase all of the assets necessary to develop, construct and operate [a Replacement Project]. [SunEnergy] shall provide said Replacement Project, which shall be chosen at [Recurrent]'s sole discretion, to [Recurrent] within 5 business days of [Recurrent]'s written election.

(LOI ¶ 3.) SunEnergy was required to "make additional projects available as Replacement Projects" once it identified such projects. (LOI Annex C n.10.) SunEnergy agreed that it "will not dispose, agree to dispose, or grant exclusivity for the disposition of any Replacement Project set forth in Annex C . . . as of the date

hereof to a third party until the [TDM] for wetlands delineation for each Project has been achieved." (LOI ¶ 3.)

13. Paragraph 3 of the LOI also provided that SunEnergy

> agrees to (i) negotiate in good faith and use reasonable efforts to cause such definitive documents (the "Definitive Agreements") as may be required to consummate the Proposed Transaction . . . with a goal of executing such Definitive Agreements on or before the expiration of the Exclusivity Period . . . ; (ii) cooperate with [Recurrent] in providing such information and supplying such assistance as may be reasonably requested by [Recurrent] in connection with [Recurrent]'s development activities relating to the Projects; (iii) preserve, protect, manage, develop and operate the Projects in a reasonable and prudent manner in accordance with all applicable laws and regulations and in accordance with the [TDM]; (iv) consult with and cooperate in good faith with [Recurrent] on all material decisions relating to the Projects; and (v) use commercially reasonable efforts to obtain all consents or approvals required in connection with the Proposed Transaction in accordance with the [TDM] . . . .

(LOI ¶ 3.)

14. The Exclusivity Payment was non-refundable, except for several specifically described circumstances set forth in paragraph 4. (LOI ¶ 4a.) Paragraph 4b of the LOI provided that if SunEnergy "fails to achieve the [TDM] for a Project . . . due to a wetlands issue with such Project, then 100% of the Exclusivity Payment for the applicable Project will be refunded to [Recurrent] within sixty (60) days of the date of [Recurrent]'s written election." (LOI ¶ 4b.) Paragraph 4c of the LOI stated that

> [i]n the event [SunEnergy] fails to provide a Replacement Project as provided in [paragraph] 3 with the same MWac capacity as the original Project, then 37.5% of the Exclusivity Payment for the applicable Project will be refunded to [Recurrent] within sixty (60) days of the date of [Recurrent]'s written election.

(LOI ¶ 4c.)

15.     In addition to the provisions concerning the Projects and the Proposed Transaction, the LOI contained a provision regarding a potential tax equity transaction (the "Tax Equity Provision"). (LOI ¶ 14.) The Tax Equity Provision stated that Recurrent and SunEnergy "shall use best efforts to negotiate in good faith for [Recurrent] to provide a 2016 tax-equity investment in the Williamson [sic] Speight solar photovoltaic project being developed and constructed by [SunEnergy] in Martin County" (the "Tax Equity Transaction"). (LOI ¶ 14.)

C.     **Amazon and Nestlé Bids**

16.     On February 11, 2016, Recurrent made a $2 million Exclusivity Payment to SunEnergy for Earleys (the "Earleys Exclusivity Payment") and a $2 million Exclusivity Payment to SunEnergy for Haslett (the "Haslett Exclusivity Payment"). (Am. Compl. ¶ 10; Answer 3, ¶ 10.)

17.     Also on February 11, 2016, Recurrent submitted its response to the Amazon RFP, bidding the Earleys and Haslett solar project sites and the power those sites were estimated to generate. (Def.'s Mem. Supp. Dep. Ex. 52; Pl.'s Resp. Opp'n Ex. 2, at 54:21−24.) In order to determine the pricing for Earleys and Haslett that Recurrent proposed in its bid to Amazon, Recurrent created financial models for both the Earleys and Haslett sites using a variety of assumptions and site-specific inputs. (Def.'s Mem. Supp. Tab 1, at 52:13−53:12; Pl.'s Resp. Opp'n Ex. 3, at 136:1−3; Def.'s Mem. Opp'n Tab 12, at 59:13−60:1.) Based on these financial models, the pricing of

power generated at Earleys priced lower than the power generated at Haslett. (Def.'s Mem. Opp'n Tab 12, at 34:18–21; Pl.'s Resp. Opp'n Ex. 2, at 119:6–8.)

18. Recurrent, however, was concerned that SunEnergy would not be able to develop Earleys due to a wetlands issue on the site and, as a result, that Recurrent would not be able to deliver power at the Earleys pricing to Amazon if Recurrent won the bid. (Def.'s Mem. Supp. Dep. Ex. 51, at REDH-00012350; Pl.'s Resp. Opp'n Ex. 2, at 119:8–21.) Because of these concerns, Recurrent did not want Amazon to shortlist only the Earleys project. (Def.'s Mem. Supp. Dep. Ex. 51, at REDH-00012350; Pl.'s Resp. Opp'n Ex. 2, at 120:1–12.) In order to avoid this outcome, Recurrent made Earleys less competitive by submitting a bid that set pricing for electricity produced at Earleys slightly higher than the pricing for electricity produced at Haslett. (Def.'s Mem. Supp. Dep. Ex. 51, at REDH-00012350; Def.'s Mem. Supp. Dep. Ex. 52, at REDH-00013254; Pl.'s Resp. Opp'n Ex. 2, at 120:1–6; Def.'s Mem. Opp'n Tab 12, at 34:18–35:2.)

19. On March 4, 2016, SunEnergy gave Recurrent access to data for the Replacement Projects, and Recurrent began conducting due diligence on the Replacement Projects. (Def.'s Mem. Supp. Dep. Ex. 57; Pl.'s Mem. Supp. Mot. Summ. J. ["Pl.'s Mem. Supp."] Ex. 32, ECF No. 58.1.) Early in its due diligence, Recurrent learned that two of the Replacement Projects, Shawboro and Hobbsville, also had wetlands issues. (Pl.'s Mem. Supp. Exs. 32–33; Pl.'s Resp. Opp'n Ex. 5, at 166:23–167:12.) As a result, Recurrent focused its due diligence efforts and analysis

on the remaining Replacement Project, Moyock. (Def.'s Mem. Opp'n Tab 7, at 83:5–7; Def.'s Mem. Opp'n Tab 10, at 254:2–9.)

20.     On March 11, 2016, Recurrent submitted a bid in response to an RFP from Nestlé that used the same pricing strategy for Earleys and Haslett that Recurrent used in its Amazon bid. (Def.'s Mem. Supp. Dep. Ex. 58, at REDH-00013281; Pl.'s Resp. Opp'n Ex. 2, at 54:21–55:1.) On that same date, Recurrent received notice that its Amazon bid was not shortlisted; however, Amazon asked Recurrent to submit a revised bid on or before March 22, 2016. (Pl.'s Mem. Supp. Ex. 39.)

21.     On March 17, 2016, SunEnergy advised Recurrent that the preliminary wetlands report for Earleys showed that "the site will not be favorable for a project this size" and "will most likely need immediate replacement with one of the back-up sites." (Pl.'s Mem. Supp. Ex. 25, ECF No. 61.)

22.     From March 18 to March 21, 2016, Recurrent analyzed Moyock in order to make sure Moyock was a viable alternative that did not have a fatal flaw and to generate new pricing that it could include in its revised Amazon bid. (Def.'s Mem. Supp. Dep. Exs. 62–65, 232, 237; Def.'s Mem. Opp'n Tab 8, at 82:6–9, 86:11–16, 89:12–17, 105:20–106:9.) Just as it had with Earleys and Haslett, Recurrent generated pricing for Moyock by creating a financial model based on site-specific inputs, production data, and assumptions. (Def.'s Mem. Supp. Dep. Exs. 62, 65, 232, 237; Def.'s Mem. Opp'n Tab 8, at 105:20–106:3; Def.'s Mem. Opp'n Tab 12, at 57:3–5, 58:9–11.) Similar to the Earleys pricing, the Moyock model yielded lower pricing than Haslett. (Def.'s Mem. Supp. Dep. Exs. 65, 237, at REDH-00013779.)

23. On March 21, 2016, the Recurrent team that modeled Moyock gave a written presentation to Recurrent's Risk Review Committee to obtain approval to submit a lower bid to Amazon. (Def.'s Mem. Supp. Dep. Ex. 237, Tab 2, at 80:18−23.) The proposal contained revised pricing for Haslett and pricing utilizing the modeling completed for Moyock, with Moyock's pricing the lower of the two. (Def.'s Mem. Supp. Dep. Ex. 237, at REDH-00013779.) The proposal was approved by Recurrent's Risk Review Committee that same day. (Def.'s Mem. Opp'n Tab 8, at 124:4−11; Def.'s Mem. Opp'n Tab 12, at 101:14−16.)

24. After the risk review meeting, however, Recurrent decided that it would keep the name "Earleys" in the revised bid and increase the pricing generated by the Moyock model to make it slightly less competitive than Haslett, just as it had done with the Earleys pricing in its first bid. (Def.'s Mem. Supp. Dep Ex. 239; Pl.'s Mem. Supp. Ex. 18, at 113:14−19; Pl.'s Mem Supp. Ex. 39; Def.'s Mem. Opp'n Tab 12, at 102:15−23, 106:14−22.) The revised bid identified the Haslett and Earleys project sites, with the power generated at Earleys priced slightly higher than the power generated at Haslett. (Pl.'s Mem. Supp. Ex. 39.) Two days later, Recurrent submitted a revised bid to Nestlé that contained the updated pricing strategy that it used in its revised bid to Amazon. (Def.'s Mem. Supp. Dep. Exs. 70−71; Pl.'s Mem. Supp. Ex. 14, at 221:23−222:11.)

**D.     Recurrent's Continued Due Diligence on Moyock**

25. After Recurrent submitted its revised bids to Amazon and Nestlé, Recurrent continued to evaluate and conduct due diligence on Moyock through at

least mid-April. (Pl.'s Mem. Supp. Ex. 11, at 168:11–14, 257:13–258:7; Pl.'s Mem. Supp. Ex. 36; Pl.'s Resp. Opp'n Ex. 2, at 226:5–12; Pl.'s Resp. Opp'n Ex. 3, at 138:19–22; Pl.'s Resp. Opp'n Ex. 5, at 173:12–22, 217:17–19.) Recurrent provided "Q&A" logs to SunEnergy in which Recurrent posed questions about various aspects of Moyock, and SunEnergy updated the log with information in response to those questions as it became available. (Def.'s Mem. Supp. Dep. Ex. 57; Pl.'s Mem. Supp. Exs. 35–36; Def.'s Mem. Opp'n Tab 10, at 253:24–254:1.) Additionally, Recurrent reviewed the documentation that was available and continued to model production data for Moyock. (Def.'s Mem. Opp'n Tab 7, at 83:7–12; Def.'s Mem. Opp'n Tab 12, at 56:17–22; Def.'s Mem. Opp'n Dep. Ex. 243.)

26. On April 19, 2016, Recurrent learned that its revised Amazon bid was not shortlisted. (Def.'s Mem. Supp. Dep. Ex. 79; Def.'s Mem. Opp'n Tab 2, at 240:16–20.)

27. SunEnergy failed to meet the April 30, 2016 TDM for completion of the Earleys wetlands delineation report. (Am. Compl. ¶¶ 11–12; Answer 3–4, ¶¶ 11–12; Pl.'s Mem. Supp. Ex. 33.)

28. On May 2, 2016, the next business day after the April 30, 2016 TDM, Recurrent gave written notice to SunEnergy that, due to SunEnergy's failure to meet the April 30, 2016 TDM due to a wetlands issue, Recurrent demanded a full refund of the $2 million Earleys Exclusivity Payment pursuant to paragraph 4b of the LOI. (Pl.'s Mem. Supp. Ex. 6.) Pursuant to the express terms of the LOI, the refund was due within sixty days after Recurrent's request (on or before July 1, 2016). (LOI ¶ 4b.)

29.   SunEnergy has not refunded the Earleys Exclusivity Payment.   (Am. Compl. ¶ 34; Answer 7, ¶ 34.)

**E.   Haslett**

30.   The Haslett TDM required that SunEnergy obtain all discretionary permits, which includes a special use permit ("SUP"), by August 30, 2016.   (LOI Annex B.)   As of at least March 21, 2016, a moratorium was in place prohibiting the issuance of a SUP for a solar farm within Gates County, the county in which Haslett was located.   (Pl.'s Mem. Supp. Ex. 11, at 219:9−10; Pl.'s Mem. Supp. Ex. 44.)   On August 15, 2016, the Gates County Board of Commissioners extended the moratorium though November 13, 2016, thereby preventing SunEnergy from obtaining a SUP for Haslett by the August 30, 2016 TDM.   (Pl.'s Mem. Supp. Exs. 43, 46.)

31.   By letter dated August 22, 2016, SunEnergy notified Recurrent that it would be unable to obtain a SUP for Haslett by August 30, 2016 and requested that Recurrent agree to an extension of the TDM.   (Pl.'s Mem. Supp. Ex. 43.)   By letter dated August 29, 2016, Recurrent denied SunEnergy's request for an extension.   (Pl.'s Mem. Supp. Ex. 48.)

32.   On August 31, 2016, Recurrent gave written notice to SunEnergy that, due to SunEnergy's failure to meet the August 30, 2016 TDM for Haslett, Recurrent requested that SunEnergy provide a Replacement Project (which by definition required SunEnergy to offer a project with the same capacity for energy generation as Haslett).   (Pl.'s Mem. Supp. Ex. 8.)   Pursuant to the express terms of the LOI, SunEnergy was required to provide a Replacement Project by September 7, 2016.

(LOI ¶ 3.) SunEnergy never responded to Recurrent's August 31 letter. (Pl.'s Mem. Supp. Ex. 9, at 150:11−18.)

33.     On September 8, 2016, Recurrent gave written notice to SunEnergy that, due to SunEnergy's failure to provide a Replacement Project, Recurrent demanded a 37.5% refund of the Haslett Exclusivity Payment pursuant to paragraph 4c of the LOI. (Am. Compl. Ex. D.) Under the LOI's express terms, the refund was due by November 7, 2016. (LOI ¶ 4d.) SunEnergy never responded to Recurrent's September 8 letter. (*See* Def.'s Mem. Opp'n Tab 6, at 153:8−16.)

F.      **Tax Equity Transaction and Fee Letter**

34.     As discussed above, Recurrent and SunEnergy agreed in the LOI to the Tax Equity Provision, which required Recurrent and SunEnergy to "use best efforts to negotiate in good faith" the Tax Equity Transaction. (LOI ¶ 14.) Tax credits and accelerated depreciation can be claimed on new solar projects, but few solar developers have sufficient taxable income to take full advantage of the tax credits and accelerated depreciation. (Answer 10, ¶ 4; Reply ¶ 4; Def.'s Mem. Opp'n Tab 5, at 57:24−58:3; Def.'s Mem. Opp'n Tab 9, at 14:14−18.) As a result, solar developers often involve a tax equity investor as a co-owner of the solar project. (Def.'s Mem. Opp'n Tab 9, at 14:3−8.) The tax equity investor provides a portion of the capital necessary to cover the cost of building the project in exchange for receipt of the assignment of the tax credits, some utilization of the accelerated depreciation, and cash distributions after the solar project goes into commercial operation. (Def.'s Mem. Opp'n Tab 5, at 57:12−58:5; Def.'s Mem. Opp'n Tab 9, at 14:3−13.)

35.     On June 7, 2016, following four months of negotiations, Recurrent and SunEnergy agreed to a term sheet (the "Term Sheet") that outlined the high-level overview of the tax equity transaction. (Pl.'s Mem. Supp. Exs. 3, 26, 49, 52; Def.'s Mem. Opp'n Dep. Exs. 136, 199.) The Term Sheet set forth the parameters for a "partnership flip" transaction whereby Recurrent would make a tax equity investment in the Williamston Speight solar project ("Williamston Speight"). (*See* Pl.'s Mem. Supp. Ex. 3 ["Term Sheet"].) In exchange, Recurrent would be allocated investment tax credits under Section 48(a) of the Internal Revenue Code. (Term Sheet, at REDH-00000408–09, -00000412.)

36.     The Term Sheet stated that certain matters were still under discussion and that Recurrent's "ability to sign definitive agreements and to proceed with funding is contingent upon, among other things, [Recurrent]'s completion of a customary due diligence process[.]" (Term Sheet, at REDH-00000408 n.2.) The Term Sheet also provided that its "terms and economic indication are made based on the information provided by [Kenny Habul ('Habul'), chief executive officer of SunEnergy] without regard to the accuracy of the information provided and remains [sic] subject to, among other things, appropriate documentation, due diligence and the review of tax counsel." (Term Sheet, at REDH-00000409.)

37.     The Term Sheet disclosed that Habul owns Williamston Speight Solar, LLC (the "Project Company"), which owns the rights to Williamston Speight. (Term Sheet, at REDH-00000408–09.) The parties agreed that Recurrent and SunEnergy would form a limited liability company (the "Holding Company"), which would be the sole

member and manager of the Project Company. (Term Sheet, at REDH-00000409.) Recurrent and Habul would be the members of the Holding Company. (Term Sheet, at REDH-00000408−09.) Recurrent would make its tax equity investment in Williamston Speight by making capital contributions to the Holding Company. (Term Sheet, at REDH-00000408−09.) The Term Sheet stated that Recurrent anticipated investing $1.25 for every $1.00 of investment tax credit. (Term Sheet, at REDH-00000409 n.4.) The Holding Company would then pay SunEnergy to develop and construct Williamston Speight, allowing the Holding Company to claim investment tax credits. (*See* Term Sheet, at REDH-00000409 & n.4.)

38. A central issue in the parties' negotiations was the amount that the Holding Company would pay SunEnergy to develop Williamston Speight. (*See* Answer 11, ¶ 8; Reply ¶ 8; Def.'s Mem. Opp'n Dep. Ex. 136, Tab 9, at 39:21−40:5.) The Term Sheet provided that the Holding Company would pay "the lesser of (a) [$]1.88 per watt and (b) the fair market value of the eligible property as determined by appraisal."[1] (Term Sheet, at REDH-00000409 n.4.) Under IRS regulations, a taxpayer may claim investment tax credits in an amount equal to 30% of its investment tax credit basis in a project. (Def.'s Mem. Opp'n Tab 2, at 266:11−13; Def.'s Mem. Opp'n Tab 3, at 37:15−16, 38:22−39:14.) The taxpayer's investment tax credit basis is, approximately, equal to the total cost of the project. (Def.'s Mem. Opp'n Tab 3, at 37:15−16, 38:1−9.) Thus, here, the Holding Company's investment

---

[1] The Term Sheet estimated that Williamston Speight would generate 15 MWac of electricity. Based on a $1.88 per watt construction price, the total amount paid to SunEnergy for construction of the project would be $28.2 million.

tax credit basis would be the price it paid SunEnergy, as the contractor, to build Williamston Speight, and its investment tax credits would be equal to 30% of that price. (*See* Def.'s Mem. Opp'n Tab 3, at 38:22−39:14.) In order to withstand IRS scrutiny, the fair market value of a solar project is often assessed by an independent third-party appraiser, and a taxpayer who pays more than fair market value for development of a project is subject to significant audit risk. (Pl.'s Mem. Supp. Ex. 13, at 46:14−17, 54:12−16; Pl.'s Mem. Supp. Ex. 15, at 60:13−20; Pl.'s Mem. Supp. Ex. 17, at 61:25−62:11.)

39. The Term Sheet provided that SunEnergy "will be responsible and liable for all reasonable and documented costs and expenses of [Recurrent] in connection with the transaction on the terms set forth in a fee letter entered into between SunEnergy[] and [Recurrent]" and stated that SunEnergy was to make a legal expense deposit of $50,000 to Recurrent. (Term Sheet, at REDH-00000418−19.)

40. On June 7, 2016, the same date that the parties agreed to the Term Sheet, Recurrent and SunEnergy executed a fee letter (the "Fee Letter"). (Pl.'s Mem. Supp. Ex. 2; Def.'s Mem. Opp'n Dep. Ex. 199.) The Fee Letter stated, in relevant part, that

> [r]eference is made to the [LOI], dated as of February 11, 2016 . . . .
>
> In accordance with [the Tax Equity Provision] of the LOI, [Recurrent] . . . and [SunEnergy] and Kenny Habul . . . are negotiating a potential Tax Equity Transaction. In connection with the foregoing, . . . [SunEnergy] agrees as follows:
>
> (a) [SunEnergy] will cause its affiliate that is the managing member of the tax equity partnership to reimburse [Recurrent] for all reasonable and documented costs and expenses incurred by [Recurrent] in connection with the Tax Equity Transaction . . . , and

(b) without limiting the foregoing, within two (2) business days of the date hereof, [SunEnergy] will cause [Recurrent] to be provided a non-refundable deposit of $50,000 to be applied by [Recurrent] to legal costs incurred by [Recurrent] in connection with the Tax Equity Transaction . . . .

For the avoidance of doubt, if, for any reason, the managing member of the tax equity partnership is unable to reimburse [Recurrent] for the amounts described in (a) above, [SunEnergy] hereby agrees to reimburse [Recurrent] directly for all such amounts within the timeframes set forth in this fee letter. The amounts required to be paid pursuant to clause (a) above will be payable . . . on the earlier of:

(x) the date of the first funding under the Tax Equity Transaction; and

(y) fifteen (15) business days following the date that (i) [Recurrent] or [SunEnergy] has provided notice to the other that it has decided not to proceed with the Tax Equity Transaction and (ii) [Recurrent] has made a written demand for such amounts . . . .

(Pl.'s Mem. Supp. Ex. 2.)

41. SunEnergy wired Recurrent the $50,000 deposit that same day. (Def.'s Mem. Opp'n Dep. Ex. 199.)

42. On or around June 9, 2016, SunEnergy and Recurrent began discussing the Williamston Speight model. (Pl.'s Mem. Supp. Ex. 57.) Recurrent took the information from SunEnergy's model, reworked it, and put it into a model that Recurrent had used previously. (Pl.'s Mem. Supp. Ex. 15, at 88:23−89:13.) Both Recurrent's and SunEnergy's initial models included a separate revenue stream for the sale of renewable energy credits ("RECs") in addition to the revenue stream for the sale of power. (Def.'s Mem. Opp'n Tab 4, at 78:5−14.) On June 16, 2016, Recurrent sent SunEnergy its revised model, dated June 15, 2016, which projected

total revenue for the project at $88,990,389. (Pl.'s Reply Supp. Mot. Summ. J. ["Pl.'s Reply"] Ex. 81, ECF No. 93.)

43. Thereafter, SunEnergy provided Recurrent with a power purchase agreement ("PPA") by which Dominion North Carolina Power ("Dominion") agreed to purchase the power generated at Williamston Speight. (Pl.'s Mem. Supp. Ex. 15, at 205:8–16.) Recurrent reviewed the PPA and noticed that, according to its express terms, the RECs and power were bundled such that Dominion, as the purchaser of the power, also received the rights to the RECs. (Pl.'s Mem. Supp. Ex. 15, at 205:17–24, 212:4–10.) Therefore, to be consistent with the PPA, the Williamston Speight models prepared by both Recurrent and SunEnergy should not have contained a separate revenue stream for the RECs. (Pl.'s Mem. Supp. Ex. 15, at 212:14–23; Def.'s Mem. Opp'n Tab 6, at 222:2–223:16.)

44. On June 22, 2016, Recurrent e-mailed SunEnergy about this issue, and SunEnergy agreed that the RECs needed to be taken out of the model. (Pl.'s Reply Ex. 83.) That same day, Recurrent sent SunEnergy an updated projection reflecting total revenue of $80,777,893—a reduction of over $8 million dollars. (Pl.'s Reply Ex. 83.)

45. Also on June 22, 2016, Keith Martin ("Martin"), SunEnergy's outside counsel, called Mitch Randall, Recurrent's chief executive officer, and left him the following message:

> Habul called me. He's had two projects fall through, one, recently, meaning this morning, $173M project he was building for Dominion. The North Carolina bathroom law is causing problems with these projects and he's now in a position where he's thinking he needs to sell

Williamston Speight. . . . And given how much work you guys have put into this already he's wondering, he wants to offer it to you first before going out anywhere else. So could you give me a call? I'll explain more of the circumstances to you. . . . I'm also going to mention to Jeff, your lawyer, and John Eliason that they should stop work on the tax equity deal.

(Pl.'s Mem. Supp. Ex. 60.)

46. The timeline of events that occurred after this message is unclear. Shortly after Martin's message, Recurrent offered to purchase Williamston Speight for approximately $1.00 per watt, which SunEnergy rejected, and SunEnergy approached Recurrent to resume their tax equity negotiations. (Pl.'s Mem. Supp. Ex. 15, at 217:11−25; Def.'s Mem. Opp'n Tab 6, at 182:1−3; Def.'s Mem. Opp'n Tab 9, at 111:21−23, 115:22−25.) The record is unclear as to which happened first, and there is a dispute of fact as to what occurred after the parties resumed their negotiations.

47. SunEnergy's evidence tends to show that John Eliason ("Eliason"), Recurrent's outside tax counsel, advised Martin that Recurrent would not agree to the Holding Company paying more than $1.40 per watt for construction of Williamston Speight (as compared to the $1.88 per watt estimated price contained in the Term Sheet), but that Recurrent did not have an independent appraisal to support that valuation. (Def.'s Mem. Opp'n Tab 6, at 181:4−17, 189:11−16; Def.'s Mem. Opp'n Tab 7, at 162:17−20; Def.'s Mem. Opp'n Tab 9, at 111:21−112:5, 113:25−114:14, 115:22−116:4.)

48. Conversely, Recurrent's evidence tends to show that Eliason, at Recurrent's instruction, advised Martin that an appraisal of Williamston Speight would likely value the project at around $1.40 per watt. (Pl.'s Mem. Supp. Ex. 15, at 252:18−253:4;

Pl.'s Mem. Supp. Ex. 17, at 61:5−19.) Recurrent contends that it always intended to have the fair market value of Williamston Speight assessed by an independent appraiser, but that, based on Recurrent's internal modeling, it wanted to let SunEnergy know up front that a valuation was likely to come out significantly lower than the $1.88 per watt value that SunEnergy expected. (*See* Pl.'s Mem. Supp. Ex. 15, at 252:18−253:4.)

49. On July 5, 2016, Habul e-mailed David Fisher ("Fisher"), Recurrent's chartered financial analyst responsible for modeling Williamston Speight, and informed him that SunEnergy was referring matters to its attorneys in light of Recurrent's recent price drop and unreasonable purchase offer. (Def.'s Mem. Opp'n Dep. Ex. 22.)

50. Recurrent incurred a total of $123,543.19 in costs and expenses in connection with the Tax Equity Transaction. (Pl.'s Mem. Supp. Ex. 7.) After applying SunEnergy's $50,000 deposit, Recurrent demanded reimbursement from SunEnergy of $73,543.19 by letter dated July 19, 2016. (Pl.'s Mem. Supp. Ex. 7.) Pursuant to the express terms of the Fee Letter, SunEnergy was required to reimburse Recurrent by August 9, 2016. (Pl.'s Mem. Supp. Ex. 2.) SunEnergy has not reimbursed Recurrent for its costs and expenses incurred in connection with the Tax Equity Transaction. (Am. Compl. ¶ 34; Answer 7, ¶ 34.)

## III. PROCEDURAL HISTORY

51. Recurrent filed its complaint initiating this action on August 23, 2016 and an Amended Complaint on September 8, 2016. The Amended Complaint asserts

claims for a declaratory judgment[2], breach of the LOI, and breach of the Fee Letter. (Am. Compl. 8, 10, 12.) In its claim for breach of the LOI, Recurrent alleges that SunEnergy breached the LOI by failing to refund the $2 million Earleys Exclusivity Payment, failing to provide a Replacement Project for Haslett, and failing to cooperate with Recurrent's due diligence on the Proposed Transaction and negotiate in good faith and use reasonable efforts to consummate the Proposed Transaction. (Am. Compl. ¶¶ 40–47.) In its claim for breach of the Fee Letter, Recurrent alleges that SunEnergy breached the Fee Letter by failing to reimburse Recurrent's costs and expenses incurred in connection with the Tax Equity Transaction. (Am. Compl. ¶ 52.)

52. This case was designated as a mandatory complex business case by order of the Honorable Mark Martin, Chief Justice of the Supreme Court of North Carolina, dated August 26, 2016, (ECF No. 4), and assigned to the undersigned by order of Chief Business Court Judge James L. Gale dated August 29, 2016, (ECF No. 5).

53. SunEnergy filed an answer on November 9, 2016 and an amended answer and counterclaim on December 9, 2016. SunEnergy asserts a counterclaim for breach of the LOI, alleging that Recurrent breached the Tax Equity Provision by imposing an artificial cap on the price that the Holding Company would pay SunEnergy to develop Williamston Speight. (Answer 13.)

---

[2] Recurrent's declaratory judgment claim is effectively identical to, and seeks the same relief as, its claims for breach of the LOI and breach of the Fee Letter. (*See* Am. Compl. ¶¶ 28–53.) At the hearing on the Motions, Recurrent conceded that its declaratory judgment claim is redundant and that resolution of its second and third claims would in effect resolve its declaratory judgment claim.

54. On March 7, 2017, the Court entered an order and opinion denying Recurrent's motion for partial judgment on the pleadings and motion to strike or dismiss SunEnergy's counterclaim. (ECF No. 38.)

55. On March 24, 2017, Recurrent filed its reply to SunEnergy's counterclaim.

56. Following discovery, on March 16, 2018, the parties filed their respective motions for summary judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure ("Rule(s)"). (ECF Nos. 52, 58.) Recurrent moves for summary judgment on its second claim for breach of the LOI insofar as this claim pertains to a refund of the Earleys and Haslett Exclusivity Payments, and on its third claim for breach of the Fee Letter. (Pl.'s Mot. Summ. J. 1.) Recurrent's motion further seeks entry of judgment in its favor dismissing SunEnergy's counterclaim for breach of the LOI. (Pl.'s Mot. Summ. J. 1.) SunEnergy moves for summary judgment seeking judgment in its favor dismissing Recurrent's claims for a declaratory judgment and breach of the LOI insofar as these claims pertain to a refund of the Earleys Exclusivity Payment. (SunEnergy's Mot. Partial Summ. J. 1.)

57. The Motions have been fully briefed, and the Court held a hearing and heard oral arguments on the Motions on May 21 and May 22, 2018. The Motions are now ripe for resolution.

## IV. LEGAL STANDARD

58. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled

to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c). "A 'genuine issue' is one that can be maintained by substantial evidence." *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000).

59. The moving party bears the burden of showing that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Hensley v. Nat'l Freight Transp., Inc.*, 193 N.C. App. 561, 563, 668 S.E.2d 349, 351 (2008). "If the movant successfully makes such a showing, the burden then shifts to the non-movant to come forward with specific facts establishing the presence of a genuine factual dispute for trial." *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 579, 573 S.E.2d 118, 124 (2002). The Court must view the evidence in the light most favorable to the nonmovant. *Dobson*, 352 N.C. at 83, 530 S.E.2d at 835. However, the nonmovant "may not rest upon the mere allegations or denials of [its] pleading, but [its] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If [the nonmovant] does not so respond, summary judgment, if appropriate, shall be entered against [the nonmovant]." N.C. Gen. Stat. § 1A-1, Rule 56(e).

## V. ANALYSIS

### A. Choice of Law

60. As a preliminary matter, the Court must determine which state's law applies to the parties' claims. The LOI and the Fee Letter contain a New York choice of law clause. (LOI ¶ 9; Pl.'s Mem. Supp. Ex. 2.) Our Court of Appeals has stated that a contractual choice of law provision will be given effect unless the chosen state

has no substantial connection to the transaction and there is no other reasonable basis for the parties' choice, or the law of the chosen state violates a fundamental public policy of North Carolina. *Cable Tel Servs., Inc. v. Overland Contracting, Inc.*, 154 N.C. App. 639, 642–43, 574 S.E.2d 31, 33–34 (2002).

61. Here, all parties agree that North Carolina law applies despite the New York choice of law clauses because the LOI and the Fee Letter have no connection to New York. The Court agrees that, on the record before it, neither the LOI nor the Fee Letter have any connection to New York. The parties to the LOI and the Fee Letter are Delaware and North Carolina limited liability companies with their principal offices in California and North Carolina, respectively. Both the LOI and the Fee Letter concern solar projects under construction and development in North Carolina. Further, the record before the Court does not provide any basis for the parties' New York choice of law clauses. Accordingly, the Court concludes that New York law does not apply to the LOI or the Fee Letter.[3]

---

[3] The Court notes that in an unrelated action, our Court of Appeals recently concluded that, due to a Florida choice of law clause, Florida law governed the interpretation of the parties' contracts. *Press v. AGC Aviation, LLC*, __ N.C. App. __, No. COA17-9, 2018 N.C. App. LEXIS 578, at *9 (N.C. Ct. App. June 5, 2018). The Court of Appeals concluded that, even though the parties did not mention Florida law, under N.C. Gen. Stat. § 8-4, the lower court was required to take judicial notice of Florida law and apply Florida law to interpret the contracts. *Id.* at *9–10. Although the Court of Appeals did not address the issue, it appears that there was a substantial connection between Florida and the parties' agreements so as to require the courts in *Press* to give effect to the Florida choice of law clause. *See id.* at *2–6. The Court believes that *Press* is distinguishable on its facts and is not controlling under the facts of this case.

62. "[T]he interpretation of a contract is governed by the law of the place where the contract was made." *Id.* at 642, 574 S.E.2d at 33 (quoting *Land Co. v. Byrd*, 299 N.C. 260, 262, 261 S.E.2d 655, 656 (1980)). "[A] contract is made in the place where the last act necessary to make it binding occurred." *Schwarz v. St. Jude Med., Inc.*, 802 S.E.2d 783, 790 (N.C. Ct. App. 2017) (quoting *Tom Togs, Inc. v. Ben Elias Indus. Corp.*, 318 N.C. 361, 365, 348 S.E.2d 782, 785 (1986)).

63. The record tends to show that the LOI and Fee Letter were made in North Carolina when SunEnergy signed both agreements and, therefore, the Court concludes that North Carolina law applies to these contracts. *Szymczyk v. Signs Now Corp.*, 168 N.C. App. 182, 187, 606 S.E.2d 728, 733 (2005) ("[T]he last act of signing the contract was an essential element to formation."); *Cable Tel Servs., Inc.*, 154 N.C. App. at 643, 574 S.E.2d at 34 (applying North Carolina law where plaintiff signed the contract in North Carolina and returned it to defendant in Kansas).

**B.   The LOI Is a Valid Contract**

64. "The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000). A valid contract requires assent, mutuality of obligation, and definite terms. *Charlotte Motor Speedway, LLC v. Cty. of Cabarrus*, 230 N.C. App. 1, 7, 748 S.E.2d 171, 176 (2013). "Generally, letters of intent are found to be unenforceable agreements to agree when relied upon to enforce the contemplated transaction." *Insight Health Corp. v. Marquis Diagnostic Imaging of N.C., LLC*, 2016 NCBC LEXIS 77, at *13 (N.C. Super. Ct. Oct. 7, 2016) (concluding a

letter of intent was not a valid contract where its plain language made clear that it was not a binding agreement); *Remi Holdings, LLC v. IX WR 3023 HSBC Way L.P.*, 2016 NCBC LEXIS 110, at \*10 (N.C. Super. Ct. Dec. 12, 2016) (same).

65. Here, the plain language of the LOI makes clear that, while titled a "Letter of Intent" rather than a "Contract" or "Agreement," the LOI was in fact a binding agreement, and the parties do not dispute this conclusion. The LOI set forth the parties' "agreement on certain matters pending consummation of the Proposed Transaction." (LOI ¶ C.) The LOI obligated both parties and expressly provided that "[t]ermination of this LOI shall not relieve either Party from any liability for breach of the binding terms of this LOI occurring prior to such termination." (LOI ¶ 8.) Further, the terms of the LOI are sufficiently definite to be enforceable, and the parties' assented to the LOI by signing it. Therefore, the Court concludes that the LOI is a valid contract.

## C.    Refund of the Earleys Exclusivity Payment

66. Recurrent and SunEnergy cross-move for summary judgment on Recurrent's second claim for breach of the LOI insofar as this claim seeks a full refund of the Earleys $2 million Exclusivity Payment under the LOI.[4]

---

[4] SunEnergy also moves for summary judgment on Recurrent's declaratory judgment claim to the extent that it seeks a full refund of the Earleys Exclusivity Payment, which, as discussed above, is duplicative of and subsumed into Recurrent's claim for breach of the LOI.

### 1. SunEnergy's Motion

67.   SunEnergy argues that it is entitled to summary judgment on Recurrent's claim for a full refund of the Earleys Exclusivity Payment because Recurrent elected Moyock as a Replacement Project for Earleys in lieu of seeking a refund.  (Def.'s Mem. Supp. 17.)

> #### a.   Recurrent did not exercise its right to purchase Moyock because it did not provide written election to SunEnergy.

68.   The LOI's express terms stated that if SunEnergy fails to meet the TDM for a project, Recurrent "shall have the right, by *written election* to [SunEnergy], to purchase all of the assets necessary to develop, construct and operate [a Replacement Project].   [SunEnergy] shall provide said Replacement Project . . . to [Recurrent] within 5 business days of [Recurrent]'s *written election*."  (LOI ¶ 3 (emphasis added).) It is undisputed that Recurrent never elected Moyock in writing, (Pl.'s Resp. Opp'n Ex. 2, at 343:4−7); rather, SunEnergy argues that Recurrent elected Moyock by including Moyock in its revised bids to Amazon and Nestlé and by conducting due diligence on Moyock.  The Court finds both of these arguments unpersuasive.

69.   "Interpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution." *RME Mgmt., LLC v. Chapel H.O.M. Assocs., LLC*, 795 S.E.2d 641, 645 (N.C. Ct. App. 2017). "[W]hen the terms of a contract are plain and unambiguous, there is no room for construction.  The contract is to be interpreted as written, and enforce[d] . . . as the parties have made it." *State v. Philip Morris USA Inc.*, 363 N.C. 623, 632, 685 S.E.2d

85, 91 (2009) (omission and second alteration in original) (citation and quotation marks omitted). It is presumed that the parties intended what the chosen language in the contract clearly expresses, and the Court cannot rewrite the contract or impose terms for which the parties did not bargain. *See McIntyre v. McIntyre*, 188 N.C. App. 26, 31, 654 S.E.2d 798, 801 (2008) ("[I]t must be presumed the parties intended what the language used clearly expresses, and the contract must be construed to mean what on its face it purports to mean."); *Duke Energy Corp. v. Malcolm*, 178 N.C. App. 62, 65, 630 S.E.2d 693, 695 (2006) ("[I]f the meaning of the [contract] is clear and only one reasonable interpretation exists, the courts must enforce the contract as written; they may not, under the guise of construing an ambiguous term, rewrite the contract or impose liabilities on the parties not bargained for and found therein." (alterations in original)); *Cater v. Barker*, 172 N.C. App. 441, 445, 617 S.E.2d 113, 116–17 (2005) ("It is a well-settled principle of legal construction that it must be presumed the parties intended what the language used clearly expresses, and the contract must be construed to mean what on its face it purports to mean. . . . Presumably the words which the parties select were deliberately chosen and are to be given their ordinary significance."), *aff'd*, 360 N.C. 357, 625 S.E.2d 778 (2006); *Internet E., Inc. v. Duro Commc'ns, Inc.*, 146 N.C. App. 401, 405, 553 S.E.2d 84, 87 (2001) ("Where the terms of a contractual agreement are clear and unambiguous, the courts cannot rewrite the plain meaning of the contract.").

70. Here, the LOI clearly and unambiguously provided that Recurrent had the right to purchase a Replacement Project by written election to SunEnergy. It is

undisputed that Recurrent did not give such written election to SunEnergy. Therefore, under the express terms of the LOI, Recurrent did not elect to purchase Moyock as a Replacement Project for Earleys.

> ### b. SunEnergy's arguments that Recurrent's actions are sufficient to constitute an election, notwithstanding the failure to give written notice, are unavailing.

71. SunEnergy contends that Recurrent obtained the benefit of using Moyock in its bids to third-party purchasers, but concealed its use thereof to retain the option of a refund. (Def.'s Mem. Supp. 18, 23.) SunEnergy maintains that the doctrine of election of remedies does not permit Recurrent's tactics. (Def.'s Mem. Supp. 24.)

72. The doctrine of election of remedies prevents a plaintiff from recovering inconsistent remedies and prevents double redress for a single wrong. *United Labs., Inc. v. Kuykendall*, 335 N.C. 183, 191, 437 S.E.2d 374, 379 (1992). "The whole doctrine of election [of remedies] is based on the theory that there are inconsistent rights or remedies of which a party may avail himself, and a choice of one is held to be an election not to pursue the other." *SRS Arlington Offices 1, LLC v. Arlington Condo. Owners Ass'n, Inc.*, 234 N.C. App. 541, 547, 760 S.E.2d 330, 335 (2014). The doctrine is applied to prevent a litigant from recovering inconsistent remedies, such as rescission of a contract and damages for breach of the same, and to prevent double recovery for the same wrong, such as punitive damages for tortious conduct and treble damages for a violation of section 75-1.1 based on the same conduct. *United Labs., Inc.*, 335 N.C. at 191, 437 S.E.2d at 379.

73. The Court agrees that Recurrent could not elect to purchase a Replacement Project for Earleys and also elect a full refund of the Earleys Exclusivity Payment. Recurrent did not, however, elect or receive a Replacement Project. Recurrent made the $2 million Earleys Exclusivity Payment for the exclusive rights to purchase Earleys and market the power generated at Earleys. Recurrent did not have the *exclusive* rights to the Replacement Projects or the power generated by them unless, upon SunEnergy's failure to meet the TDM for a Project, Recurrent elected in writing to SunEnergy to purchase a Replacement Project. Paragraph 3 of the LOI prevented SunEnergy from disposing, agreeing to dispose, or granting exclusivity for the disposition of the Replacement Projects to a third party until SunEnergy achieved the TDM for wetlands delineation for both Earleys and Haslett. Thereafter, however, SunEnergy was free to enter into transactions with third parties concerning the Replacement Projects.

74. The fact that Recurrent allegedly used Moyock in its revised bids to Amazon and Nestlé—unbeknownst to SunEnergy—does not change the fact that Recurrent did not have the exclusive rights to market the power generated at Moyock. Moreover, that Recurrent sought to take advantage of the express terms of the contract—or to use SunEnergy's words, to retain the option of a refund—does not affect the Court's analysis. "Liberty to contract carries with it the right to exercise poor judgment as well as good judgment. It is the simple law of contracts that as a man consents to bind himself, so shall he be bound." *Sylva Shops Ltd. P'ship v. Hibbard*, 175 N.C. App. 423, 427, 623 S.E.2d 785, 789 (2006). The LOI, to which

SunEnergy agreed, expressly provided that Recurrent had the right to purchase a Replacement Project by written election to SunEnergy. As Recurrent did not have the exclusive rights to market the power generated at Moyock, there was a risk in using Moyock in Recurrent's revised bids to Amazon and Nestlé if that project happened to be shortlisted—but that is a risk that, at least under the LOI, Recurrent could take, however ill-advised it might be.

75. SunEnergy additionally argues that Recurrent forfeited its right to a refund of the Earleys Exclusivity Payment once it performed due diligence on Moyock. (SunEnergy's Reply Supp. Mot. Partial Summ. J. 3, ECF No. 88 ["Def.'s Reply"].) Specifically, SunEnergy argues that, in addition to the exclusive rights to market the Projects' power, Recurrent made the Exclusivity Payments in exchange for the right to conduct due diligence on the Proposed Transaction as set forth in paragraph 2. The LOI defines "Proposed Transaction" as Recurrent's interest in buying, and SunEnergy's interest in selling, "all assets necessary for the development of one or both of the Projects and, as applicable, the Replacement Project(s)[.]" (LOI ¶ B.) SunEnergy contends that a Replacement Project was only "applicable" if Recurrent had elected such Replacement Project and, accordingly, Recurrent could only perform due diligence on a Replacement Project if it had elected that Replacement Project. (Def.'s Reply 5.)

76. Although this is one reasonable interpretation of these two provisions of the LOI, another reasonable interpretation is that Recurrent's right to conduct due diligence on the Proposed Transaction—and whether the transaction would entail

Recurrent purchasing one or two projects—included the right to conduct due diligence on a Replacement Project in the event SunEnergy failed to meet the TDM for a Project.

77.     The Court concludes that whether or not Recurrent had the right to conduct due diligence on a Replacement Project before it elected such a project is immaterial. As discussed above, the LOI expressly provided that Recurrent could elect a Replacement Project by written election to SunEnergy—not by conducting due diligence. Further, the evidence is undisputed that SunEnergy provided Recurrent with data on the three Replacement Projects on March 4, 2016—before SunEnergy informed Recurrent on March 17, 2016 that the Earleys preliminary wetlands report indicated that Earleys would most likely need to be replaced. (Def.'s Mem. Supp. Dep. Ex. 57; Pl.'s Mem. Supp. Ex. 25.) It is also undisputed that Recurrent performed due diligence on the other two Replacement Projects as well as on Moyock. (Pl.'s Mem. Supp. Ex. 32; Def.'s Mem. Opp'n Tab 10, at 253:19−21; Pl.'s Resp. Opp'n Ex. 3, at 135:10−12, 136:4−6.)

78.     Most importantly, the evidence is undisputed that, as of April 6, 2016—more than one month after Recurrent began conducting due diligence on Moyock—SunEnergy knew that Recurrent had not accepted Moyock as a Replacement Project for Earleys. (Pl.'s Mem. Supp. Ex. 35.) On April 6, 2016, Kara Price ("Price"), SunEnergy's legal project manager and primary point of contact with Recurrent, stated in an internal e-mail that "Recurrent has yet to confirm they will accept Moyock as a viable substitute for [Earleys]." (Pl.'s Mem. Supp. Ex. 35.) Price further

stated that "[t]o assist in this process, we have some remaining 'to dos' to make [Recurrent] more comfortable." (Pl.'s Mem. Supp. Ex. 35.) Recurrent had discovered that Moyock was located next to a golf course community and was concerned that SunEnergy would not be able to obtain the necessary permits for Moyock due to its location. (Pl.'s Mem. Supp. Exs. 33, 35–36; Pl.'s Resp. Opp'n Ex. 3, at 139:6–14.) Recurrent requested from SunEnergy a timeline for obtaining a SUP. (Pl.'s Mem. Supp. Ex. 35.) Recurrent also requested information about a new 300-foot setback requirement that had been imposed in Currituck County, the county in which Moyock was located, and whether additional land would need to be acquired by SunEnergy to comply with this requirement. (Pl.'s Mem. Supp. Exs. 35–36.) Additionally, Recurrent inquired about the expected completion date of the wetlands delineation report. (Pl.'s Mem. Supp. Ex. 36.) Price's April 6 e-mail discussed these items about which Recurrent had inquired in conducting its due diligence and, as of April 14, 2016, SunEnergy had not addressed all of Recurrent's concerns. (Pl.'s Mem. Supp. Ex. 11, at 257:13–258:7; Pl.'s Mem. Supp. Exs. 35–36.)

79. In short, the LOI's express terms do not support an interpretation that Recurrent elected to purchase Moyock by conducting due diligence, and the evidence tends to show that, at least as of April 6, 2016, SunEnergy did not understand Recurrent to have elected to purchase Moyock as a Replacement Project solely because it conducted due diligence thereon; rather, it sought to assist Recurrent in its due diligence in an effort to assure Recurrent that Moyock was a viable

Replacement Project, presumably in hopes that Recurrent would exercise its right to elect Moyock as a replacement for Earleys.

80.     This evidence also forecloses SunEnergy's argument, in reliance on *Kearney v. Hare*, 265 N.C. 570, 144 S.E.2d 636 (1965), that Recurrent's actions (in using Moyock in its calculated bids for Amazon and Nestlé and its conduct of due diligence) could not have been understood by the parties other than as a definite declaration of Recurrent's choice to exercise its right to elect Moyock.  In *Kearney*, plaintiff-lessee and defendant-lessor entered into a one-year lease in November 1962.  The lease provided plaintiff-lessee with an option to extend the lease for an additional one-year term by giving written notice to defendant-lessor of his intention to extend the lease no later than thirty days prior to termination.  Upon such renewal, all of the terms of the lease were to continue in full force and effect, including the option to renew.  Plaintiff-lessee paid the rent for the first term ending November 1963.  At defendant-lessor's request, plaintiff-lessee paid the rent for the second lease term ending November 1964, in part by delivering to defendant-lessor a check signed by plaintiff-lessee.  Defendant-lessor contended that plaintiff-lessee did not have the option to renew the lease beyond the term ending November 1964 because plaintiff-lessee did not give defendant-lessor written notice of his intent to extend the lease a second year and, therefore, the option to renew did not continue into the second lease term.  The Supreme Court concluded that the check delivered to defendant-lessor by plaintiff-lessee, at defendant-lessor's request, "could not have been understood by the parties otherwise than as a definite declaration by [plaintiff-lessee] of his intent to occupy

the land for the following year, which he had the right to do by extending the term of the lease." 265 N.C. at 575, 144 S.E.2d at 640.

81. *Kearney* is distinguishable on its facts and does not support SunEnergy's position. First, the Supreme Court concluded that plaintiff-lessee provided the requisite written notice to defendant-lessor of plaintiff-lessee's intention to extend the lease. The Court concluded that the check was a written instrument, thereby satisfying the requirement that the notice be in writing. The Court then concluded that the check for the next year's rent could not have been understood by the parties otherwise than as a definite declaration by plaintiff-lessee of his intention to extend the lease, thereby satisfying the requirement that the writing notify defendant-lessor of plaintiff-lessee's intention to extend the lease. Here, unlike in *Kearney*, there is no written instrument by which Recurrent is alleged to have exercised its right to purchase Moyock as a Replacement Project.

82. Second, in *Kearney*, the actions by which plaintiff-lessor was said to have exercised his right to renew the lease were in his direct dealings with defendant-lessor. Here, SunEnergy contends Recurrent exercised its right to purchase Moyock through its conduct in dealings with third parties—by using Moyock in its revised bids to Amazon and Nestlé—and counsel for SunEnergy conceded during the hearing on the Motions that SunEnergy was unaware of such use until after this litigation was instituted. Further, as discussed above, the evidence tends to show that, at least as of April 6, 2016, SunEnergy did not construe Recurrent's due diligence on Moyock as an effective election to purchase Moyock. Thus, unlike in *Kearney*, where the Court

determined that plaintiff-lessor's actions could not have been understood by the parties other than as a definite declaration of plaintiff-lessor's intention to exercise his right to renew, here, not only could the parties have understood Recurrent's due diligence other than as a definite declaration that it was electing to purchase Moyock as a Replacement Project, but also SunEnergy *did* understand it otherwise.

83.     In sum, the Court concludes that, under the express terms of the LOI, the undisputed evidence shows that Recurrent did not exercise its right to purchase Moyock as a Replacement Project for Earleys.

### c.     Alternatively, Recurrent did not bid Moyock in its revised bids to Amazon and Nestlé.

84.     Alternatively, even assuming that Recurrent could elect to purchase Moyock as a Replacement Project by submitting Moyock in its bids to third-party purchasers, the Court further concludes that SunEnergy has failed to come forward with sufficient evidence that Recurrent included Moyock in its revised bids to Amazon or Nestlé.

85.     For its evidence that Recurrent included Moyock in its revised bids, SunEnergy points to Recurrent's analysis of Moyock prior to its bid submissions. While the evidence demonstrates that Recurrent analyzed Moyock, generated pricing for Moyock, and approved a proposed revised bid that contained pricing for Haslett and Moyock, the undisputed evidence shows that Recurrent did not submit the approved revised bid to Amazon or Nestlé. Instead, on March 22, 2016—the day after Recurrent approved the proposal—Recurrent decided to keep the name "Earleys" in its revised bid and artificially inflate the Earleys/Moyock pricing to make it less

competitive than Haslett. (Def.'s Mem. Supp. Dep. Exs. 66, 239; Pl.'s Mem. Supp. Ex. 18, at 113:12−19; Pl.'s Mem. Supp. Ex. 39; Def.'s Mem. Opp'n Tab 12, at 102:15−23, 106:14−22.) Although Recurrent had not uncovered any fatal flaws with Moyock at that time, Recurrent discovered that Moyock was located next to a golf course community. (Pl.'s Mem. Supp. Ex. 33; Pl.'s Resp. Opp'n Ex. 2, at 144:1−3; Pl.'s Resp. Opp'n Ex. 3, at 139:6−7.) Due to its location, Recurrent was not confident that a solar site could be built at Moyock. (Pl.'s Mem. Supp. Ex. 33; Pl.'s Resp. Opp'n Ex. 2, at 144:1−13, 149:4−11, 153:2−7; Pl.'s Resp. Opp'n Ex. 3, at 139:6−8.) By making "Earleys" (utilizing the Moyock model) less competitive, Recurrent believed it had the option to substitute a generic project that could generate power at the "Earleys" pricing that it submitted in its revised bid to Amazon on March 22, 2016. (Pl.'s Mem. Supp. Ex. 14, at 152:17−25, 154:1−11, 171:18−22; Pl.'s Mem. Supp. Ex. 19, at 129:13−18; Pl.'s Mem. Supp. Ex. 39; Pl.'s Resp. Opp'n Ex. 2, at 204:1−3.) The undisputed evidence shows that Recurrent never submitted Moyock's true pricing to Amazon or Nestlé nor did it inform either Amazon or Nestlé that the project for which it was submitting proposed pricing was Moyock. (Def.'s Mem. Supp. Dep. Exs. 70−71; Pl.'s Mem. Supp. Ex. 18, at 118:24−119:4; Pl.'s Mem. Supp. Ex. 19, at 162:19−163:3; Pl.'s Mem. Supp. Ex. 39; Pl.'s Resp. Opp'n Ex. 2, at 202:18−21.)

86. The Court concludes that, because Recurrent did not identify Moyock by name or location and did not submit Moyock's true pricing, SunEnergy has failed to show that there is not a genuine issue of material fact concerning Recurrent's

inclusion of Moyock in its revised bids to Amazon and Nestlé. Accordingly, SunEnergy's Motion is denied.

### 2. Recurrent's Motion

87. Having concluded that Recurrent did not elect Moyock as a Replacement Project, the Court turns to whether Recurrent is entitled to summary judgment on its claim for a full refund of the $2 million Earleys Exclusivity Payment.

88. Under the express terms of the LOI, Recurrent is entitled to a full refund of the Earleys Exclusivity Payment if (1) SunEnergy failed to meet the TDM for the Project, (2) such failure was due to a wetlands issue, and (3) Recurrent made a written election for a refund. (LOI ¶ 4b.) The evidence is undisputed that SunEnergy failed to meet the April 30, 2016 TDM for completion of the Earleys wetlands delineation report due to a wetlands issue and, on May 2, 2016, Recurrent made a written election for a full refund of the Earleys Exclusivity Payment in lieu of a Replacement Project. (Am. Compl. ¶¶ 11−12; Answer 3−4, ¶¶ 11−12; Pl.'s Mem. Supp. Exs. 6, 33.) As such, the Court concludes that Recurrent is entitled to judgment as a matter of law on its second claim for a full refund of the Earleys Exclusivity Payment in the principal amount of $2 million.

### D. Refund of the Haslett Exclusivity Payment

89. Recurrent moves for summary judgment on its second claim, contending that it is entitled to a 37.5% refund of the Haslett Exclusivity Payment pursuant to paragraph 4c of the LOI. SunEnergy argues that Recurrent is not entitled to a refund of the Haslett Exclusivity Payment because Recurrent's prior material breach of the

Tax Equity Provision excused SunEnergy's obligations to further perform with respect to Haslett. (Def.'s Mem. Opp'n 34.)

90. Under paragraph 4c, Recurrent is entitled to a 37.5% refund of the Haslett Exclusivity Payment if (1) SunEnergy failed to meet the TDM for Haslett, (2) Recurrent made a written election to SunEnergy to purchase a Replacement Project, (3) SunEnergy failed to provide a Replacement Project, and (4) Recurrent made a written election to SunEnergy for a refund. (LOI ¶ 4c.)

91. The evidence is undisputed that, due to the moratorium preventing the issuance of a SUP, SunEnergy failed to meet the August 30, 2016 Haslett TDM for discretionary permits. (Pl.'s Mem. Supp. Exs. 43, 46.) The next day, Recurrent requested in writing that SunEnergy provide a Replacement Project. (Pl.'s Mem. Supp. Ex. 8.) SunEnergy was required to provide a Replacement Project by September 7, 2016. (LOI ¶ 3.) SunEnergy never responded to Recurrent's written request, and on September 8, 2016, Recurrent demanded in writing a 37.5% refund of the Haslett Exclusivity Payment. (Def.'s Mem. Opp'n Tab 6, at 153:8−16; Am. Compl. Ex. D.) Therefore, Recurrent is entitled to a 37.5% refund of the Haslett Exclusivity Payment unless Recurrent's alleged prior material breach of the Tax Equity Provision excused SunEnergy's performance obligations with respect to Haslett.

92. "The general rule governing bilateral contracts requires that if either party to the contract commits a material breach of the contract, the other party should be excused from the obligation to perform further." *Williams v. Habul*, 219 N.C. App.

281, 293, 724 S.E.2d 104, 112 (2012). At the same time, however, "[f]ailure to perform an independent promise does not excuse nonperformance on the part of the other party." *Lake Mary Ltd. P'ship v. Johnston*, 145 N.C. App. 525, 537, 551 S.E.2d 546, 555 (2001).

> Whether covenants are dependent or independent, and whether they are concurrent on the one hand or precedent and subsequent on the other, depends entirely upon the intention of the parties shown by the entire contract as construed in the light of the circumstances of the case, the nature of the contract, the relation of the parties thereto, and other evidence which is admissible to aid the court in determining the intention of the parties.

*Williams*, 219 N.C. App. at 294, 724 S.E.2d at 112–13 (quoting *Harris & Harris Constr. Co. v. Crain & Denbo, Inc.*, 256 N.C. 110, 117, 123 S.E.2d 590, 595 (1962)).

93. In *Williams*, plaintiff and defendants entered into a settlement agreement whereby defendants agreed to purchase plaintiff's membership interests in defendant-companies for approximately $1 million. In exchange, plaintiff agreed to dismiss the litigation within five business days of receiving payment. Additionally, plaintiff bargained for a provision in the agreement concerning an electrician that plaintiff had recruited to work for one of the defendant-companies. Plaintiff insisted on including a provision in the agreement to compensate the electrician. As a result, the agreement required one of the defendant-companies to continue to employ the electrician to a date certain and pay him $5,000 per month. Defendants paid plaintiff $1 million in accordance with the agreement, but plaintiff contended that defendants breached their obligation to employ and pay the electrician and, due to this breach, plaintiff did not dismiss the litigation as required by the agreement.

94.     The Court of Appeals concluded that defendants' promise to employ and pay the electrician was independent from plaintiff's promise to dismiss the litigation. *Id.* at 294, 724 S.E.2d at 113.  The Court reasoned that the plain language of paragraph 5 of the agreement expressly linked plaintiff's obligation to dismiss the litigation to receiving defendants' payment by stating that plaintiff shall dismiss the litigation within five business days of receiving payment. *Id.*  Conversely, the Court noted that paragraph 8, the paragraph in which defendants promised to employ and pay the electrician, did not reference plaintiff's obligation to dismiss the litigation, explaining that "[t]he parties opted not to include language expressly linking Plaintiff's dismissal to Defendants' employment of [the electrician].  There is simply no nexus between the promises recited in Paragraph 5 and those recited in Paragraph 8 to permit construction of the promises in these separate provisions as mutually dependent." *Id.* at 294−95, 724 S.E.2d at 113.

95.     Here, paragraphs 1 and 3 of the LOI make clear that Recurrent paid $2 million per Project in exchange for the exclusive rights to purchase the Projects and market the Projects' power.  (LOI ¶¶ 1, 3.)   In furtherance of the Proposed Transaction, SunEnergy agreed in paragraph 3 to develop the Projects in accordance with the TDM and, if it failed to do so, agreed to provide Recurrent with a Replacement Project if Recurrent exercised its right to purchase a Replacement Project by written election to SunEnergy.  (LOI ¶ 3.)  The parties expressly linked paragraph 4c—in which SunEnergy promised a 37.5% refund—to SunEnergy's obligation in paragraph 3 to provide a Replacement Project by stating that if

SunEnergy "fails to provide a Replacement Project as provided in [paragraph] 3 . . . , then 37.5% of the Exclusivity Payment for the applicable Project will be refunded to [Recurrent] within sixty (60) days of the date of [Recurrent]'s written election." (LOI ¶ 4c.)

96. On the other hand, the parties did not include such language in paragraph 14, the Tax Equity Provision. The Tax Equity Provision, which obligated Recurrent and SunEnergy to "use best efforts to negotiate in good faith for [Recurrent] to provide a 2016 tax-equity investment in" Williamston Speight—makes no reference to the Exclusivity Payments, the Projects, the Replacement Projects, or the Proposed Transaction. (LOI ¶ 14.) Just as in *Williams*, where there was no nexus between the promises at issue, there is no nexus between the promises recited in paragraphs 3 and 4 and those recited in the Tax Equity Provision.

97. Although SunEnergy's promises to develop the Project in accordance with the TDM, provide a Replacement Project, and refund the Exclusivity Payment may have been in exchange for all of the consideration under the LOI—including Recurrent's promise in the Tax Equity Provision to use its best efforts to negotiate the Tax Equity Transaction in good faith—that does not transform the promises in paragraphs 3 and 4 and those in the Tax Equity Provision into dependent promises. *See Williams*, 219 N.C. App. at 295, 724 S.E.2d at 113 ("While Plaintiff is correct in asserting that '[t]he dismissal was in exchange for all of the settlement consideration,' the distinction between independent and dependent promises and the effect of a breach thereof remains." (alteration in original)).

98. Therefore, the Court concludes that the alleged breach of Recurrent's promise under the Tax Equity Provision did not suspend or discharge SunEnergy's duty to perform under the remaining provisions of the LOI with respect to Haslett. As a result, Recurrent is entitled to judgment as a matter of law on its claim against SunEnergy for a 37.5% refund of the Haslett Exclusivity Payment in the principal amount of $750,000.

## E. <u>Reimbursement Under the Fee Letter</u>

99. Recurrent moves for summary judgment on its third claim for breach of the Fee Letter, contending that it is entitled to reimbursement for its costs and expenses incurred in connection with the Tax Equity Transaction. SunEnergy argues, just as it did with respect to a refund of the Haslett Exclusivity Payment, that Recurrent is not entitled to reimbursement under the Fee Letter because Recurrent's prior material breach of the Tax Equity Provision excused SunEnergy's performance obligations under the Fee Letter. (Def.'s Mem. Opp'n 20−21.)

100. The promises in the Fee Letter, however, unlike the promises in *Williams* and the promises in the LOI with respect to Haslett and the Tax Equity Provision, expressly referenced the Tax Equity Provision and the parties' obligations thereunder: "In accordance with [paragraph] 14 of the LOI, [Recurrent] . . . and [SunEnergy] and Kenny Habul . . . are negotiating a potential Tax Equity Transaction." (Pl.'s Mem. Supp. Ex. 2.) The Fee Letter then stated "[i]n connection with the foregoing, . . . [SunEnergy] agrees . . . to reimburse [Recurrent] for all reasonable and documented costs and expenses incurred by [Recurrent] in connection

with the Tax Equity Transaction"—thereby supplying a nexus between SunEnergy's promise in the Fee Letter to reimburse Recurrent's costs and expenses incurred in connection with the Tax Equity Transaction and Recurrent's promise in the Tax Equity Provision to negotiate the Tax Equity Transaction in good faith. (Pl.'s Mem. Supp. Ex. 2.)

101. Therefore, the Court concludes that SunEnergy's promise in the Fee Letter and Recurrent's promise in the Tax Equity Provision are dependent and that a prior material breach of Recurrent's promise in the Tax Equity Provision would suspend SunEnergy's performance obligations under the Fee Letter. As discussed below, the Court concludes that genuine issues of material fact preclude summary judgment in favor of Recurrent on SunEnergy's counterclaim for breach of the Tax Equity Provision. As a result, Recurrent is not entitled to summary judgment on its third claim for breach of the Fee Letter, and its motion is denied as to this claim.

### F.  SunEnergy's Counterclaim

102. SunEnergy asserts a counterclaim against Recurrent seeking to recover for Recurrent's alleged breach of the Tax Equity Provision. SunEnergy alleges that Recurrent breached its obligation to use best efforts to negotiate the Tax Equity Transaction in good faith by imposing an artificial cap on the price that would be paid to SunEnergy for construction of Williamston Speight. (Answer 13, ¶¶ 15–16.) Recurrent moves for summary judgment on SunEnergy's counterclaim, contending that there is no genuine issue of material fact that Recurrent negotiated the Tax Equity Transaction in good faith.

103. As discussed previously, there is a genuine issue of fact as to whether Eliason, Recurrent's outside tax counsel, told Martin, SunEnergy's outside counsel, that Recurrent would not agree to a price higher than $1.40 per watt, or whether Eliason told Martin that an appraisal was not likely to value Williamston Speight higher than $1.40 per watt. The Court must view this evidence in the light most favorable to SunEnergy, as the non-movant. Accordingly, in considering Recurrent's Motion, the Court takes as true the evidence that Eliason, as an agent of Recurrent, told Martin, an agent of SunEnergy, that Recurrent would not agree to a price higher than $1.40 per watt.

104. SunEnergy rightly concedes that Recurrent is not bound by the Term Sheet and the $1.88 per watt price therein; instead, SunEnergy argues that there is sufficient evidence to support a finding that Recurrent capped the price to be paid to SunEnergy for construction of Williamston Speight at $1.40 per watt, an unreasonable value, in order to deliberately sabotage the tax equity negotiations, and thereby negotiated in bad faith. (Def.'s Mem. Opp'n 24–26.)

105. Viewing the evidence in the light most favorable to SunEnergy, the Court concludes that there are genuine issues of material fact as to whether Recurrent failed to negotiate in good faith by capping the price for construction of Williamston Speight at $1.40 per watt. First, there is evidence in the record that tends to show a price of $1.40 per watt was unreasonably low. After the initiation of this litigation, an independent third-party appraised the fair market value of Williamston Speight at approximately $1.57 per watt. (Pl.'s Mem. Supp. Ex. 62.) A reduction in the price

paid to SunEnergy from $1.57 to $1.40 per watt ($0.17 less per watt) would lower the total price of the project by approximately $3.5 million, a substantial amount.[5] Martin testified that Duke Energy had just paid $1.88 per watt for construction of a similar project. (Def.'s Mem. Opp'n Tab 9, at 39:6−12, 46:20−24.) Eliason testified that, in 2016, the market price for a solar project tended to be between $1.60 and $2.00 per watt, (Def.'s Mem. Opp'n Tab 3, at 47:9−19), and Fisher, Recurrent's chartered financial analyst, testified that $1.40 per watt was low compared to other comparable projects at that time, (Def.'s Mem. Opp'n Tab 5, at 250:1−9). Additionally, Habul and Lauren LaGrua, the head of SunEnergy's legal department, testified that $1.40 per watt was below SunEnergy's construction cost. (Def.'s Mem. Opp'n Tab 6, at 181:7−8; Def.'s Mem. Opp'n Tab 7, at 162:17−20.)

106.    Second, there is sufficient evidence in the record from which a reasonable jury could conclude that Recurrent's price cap constitutes a failure to negotiate in good faith. Black's Law Dictionary defines "good faith" as

> [a] state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, (3) observance of reasonable commercial standards of fair dealing in a given trade or business, or (4) absence of intent to defraud or to seek unconscionable advantage.

Black's Law Dictionary (10 ed. 2014); *see also* Merriam-Webster (defining "good faith" as "honesty or lawfulness of purpose"; "honesty in dealing with other people"; and

---

[5] The appraisal noted that the system installed at Williamston Speight was estimated to generate 20,841,000 watts (DC) of electricity, as opposed to the 15 MWac estimated in the Term Sheet. At $1.40 per watt, the total cost for Williamston Speight would be $29,177,400. The appraisal valued Williamston Speight at $32.8 million.

"honesty, fairness, and lawfulness of purpose: absence of any intent to defraud, act maliciously, or take unfair advantage").

107. Recurrent argues that the price of $1.40 per watt was a result of the improper inclusion of the RECs in the Williamston Speight model, and that it had every right to make a downward adjustment after learning material information that negatively affected the project's value. (Pl.'s Reply 6−7.) The Court agrees that Recurrent was not bound to a certain price term and that there may be circumstances under which Recurrent could, in good faith, make a downward adjustment in the price. Nevertheless, the Court must take as true the evidence offered by SunEnergy that Recurrent, without having an appraisal, informed SunEnergy that it would not agree to a price higher than $1.40 per watt—not that an appraisal was likely to value the project at $1.40 per watt due to the REC issue.

108. Further, there is sufficient evidence from which a reasonable jury could conclude Recurrent imposed the $1.40 per watt price cap for reasons other than its valuation of the project once it removed the RECs. A price of $1.40 per watt would significantly reduce the amount of Recurrent's investment in the Holding Company— the amount of Recurrent's investment at a price of $1.40 per watt would be approximately $1.25 million less than it would be at a price of $1.57 per watt and $3.75 million less than it would be at a price of $1.88 per watt.[6] Moreover, around

---

[6] This value is based on Recurrent's anticipated investment amount of $1.25 for every $1.00 of investment tax credit. As noted above, the investment tax credits are equal to 30% of the investment tax credit basis, which is approximately equal to the cost of the project. (Def.'s Mem. Opp'n Tab 2, at 266:11−13; Def.'s Mem. Opp'n Tab 3, at 37:15−16, 38:22−39:14.) At $1.57 per watt, the amount of investment tax credits

the same time that Recurrent imposed the price cap, the evidence tends to show that Recurrent learned that SunEnergy was in financial difficulty. (Def.'s Mem. Opp'n Dep. Ex. 22.)

109. "Summary judgment is rarely proper when a state of mind such as intent or knowledge is at issue." *Craddock v. Craddock*, 188 N.C. App. 806, 812, 656 S.E.2d 716, 720 (2008). Whether Recurrent acted in good faith "is precisely the type of question that depends for its resolution on a consideration of the subjective intentions and motivation of" Recurrent. *Smith v. Currie*, 40 N.C. App. 739, 743, 253 S.E.2d 645, 647 (1979). Viewing the evidence in the light most favorable to SunEnergy, a reasonable jury could conclude that Recurrent imposed the price cap for the purpose of sabotaging its negotiations with SunEnergy or significantly lowering its investment amount, rather than because it believed that the true cost of the project was $1.40 per watt. The Court believes that, at least on the record before the Court, Recurrent's motivation for imposing the price cap, and whether such a motivation constitutes a failure to negotiate in good faith in breach of the Tax Equity Provision, is not properly decided on a motion for summary judgment and is a question of fact for the jury. Accordingly, Recurrent is not entitled to judgment as a matter of law on SunEnergy's counterclaim, and Recurrent's Motion as to this claim is denied.

---

would be approximately $9,816,111, yielding a total investment of approximately $12,270,138.80. Applying these same calculations to a price of $1.40 and $1.88 per watt, Recurrent's total investment would be approximately $10,941,525 and $14,692,905, respectively.

## VI.   CONCLUSION

110.   For the foregoing reasons, the Court **DENIES** SunEnergy's Motion and **GRANTS in part** and **DENIES in part** Recurrent's Motion as follows:

A.   The Court **GRANTS** summary judgment in favor of Recurrent and against SunEnergy on Recurrent's second claim for breach of the LOI to the extent this claim pertains to a refund of 100% of the Earleys Exclusivity Payment and 37.5% of the Haslett Exclusivity Payment. This grant of partial summary judgment in Recurrent's favor is not a final judgment and may be subject to credit or offset depending upon the outcome of other claims to be tried to a jury.

B.   The Court **DENIES** summary judgment on Recurrent's third claim for breach of the Fee Letter, and this claim shall proceed to trial.

C.   The Court **DENIES** summary judgment on SunEnergy's counterclaim for breach of the LOI, and this claim shall proceed to trial.

**SO ORDERED**, this the 22nd day of June, 2018.

/s/ Michael L. Robinson
_____
Michael L. Robinson
Special Superior Court Judge
  for Complex Business Cases